* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Ledford with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties as:
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers Compensation Act.
2. The carrier on the risk is Ace USA/ESIS.
3. The plaintiff sustained a compensable injury by accident on May 6, 1996. A Form 21 was approved by the Commission on June 17, 1996, pursuant to which the plaintiff has been receiving weekly benefits of $390.00 since the date of injury, May 6, 1996.
4. The defendants requested a hearing in this matter, and contend that the plaintiff's ownership interest in and operation of Hunter Farms is suitable employment such that he is no longer entitled to receive ongoing total disability benefits.
5. The plaintiff contends that he continues to be disabled and that he should be entitled to attorneys fees pursuant to N.C. Gen. Stat. § 97-88.1.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, the plaintiff was 52 years of age. He has a high school diploma, and was a heavy equipment operator at the time of his injury by accident.
2. The plaintiff began working for the defendant-employer as a heavy equipment operator on September 24, 1990. The plaintiff suffered a compensable injury by accident on May 6, 1996, when he was struck in the head by a heavy metal sign. The plaintiff was wearing a hardhat, which was knocked off and he received serious injury to his head. The plaintiff did not lose consciousness, but he suffered a life-threatening hematoma.
3. The plaintiff was sent to Cape Fear Hospital in Wilmington. On May 7, 1996, Dr. Thomas Melin performed an emergency craniotomy to evacuate the epidural hemotoma. The plaintiff was released from Cape Fear Hospital several days later.
4. Defendants accepted the plaintiff's claim on a Form 21, which was approved by the Industrial Commission on June 17, 1996. The plaintiff has been receiving temporary total disability benefits at the rate of $390.00 per week since May 6, 1996.
5. In December 1992, the plaintiff started a family enterprise called Hunter Hog Farm with his brother James Hunter. The plaintiff and his brother maintained the hog farm despite working full-time jobs. Prior to his injury by accident on May 6, 1996, the plaintiff was responsible for the day-to-day operations of Hunter Hog Farm. His son Scott grew up helping with the hog farm, and learning the day-to-day operations.
6. As a result of his traumatic brain injury, the plaintiff suffered a change in personality that caused him to become childish, forgetful, irrational, angry, and unexpectedly belligerent. The plaintiff's personality change has affected his ability to interact with his family. As a result of his brain injury, the plaintiff has also suffered headaches, a constant ear ringing known as tinnitus, diminished cognitive abilities, anxiety and depression. Dr. Robert V. Fulk of Wilmington Ear Nose and Throat Associates first assessed the tinnitus on June 30, 1997.
7. The plaintiff has been treated consistently since his injury by Dr. Antonio E. Puente, a neuropsychologist from Wilmington. Dr. Puente has treated the plaintiff on 84 occasions between July 15, 1996 and December 9, 2002 and continues to treat the plaintiff. According to Dr. Puente, the plaintiff is psychologically impaired as a result of the closed head injury that he suffered on May 6, 1996. Dr. Puente believes that the plaintiff suffers from a closed head injury with a PTSD/anxiety/reactive depression and a chronic organic personality disorder.
8. Dr. Puente testified that the plaintiff sustained injury to the right hemisphere of his brain and that as a result his ability to understand and respond appropriately to emotional cues is very, very poor. The plaintiff's family had a hard time adjusting to his behavioral changes. The brain injury has caused the plaintiff to develop cognitive and emotional restrictions, poor memory, poor organizational skills, a hard time learning new skills, volatility, a hypersensitivity to noise, and an inability to perform repetitive tasks for extended periods of time.
9. Dr. Puente concluded that the plaintiff is not cognitively intact and is psychologically impaired due to his closed head injury. Dr. Puente was also aware (from his ongoing treatment of the plaintiff and his discussions with the plaintiff's wife Dale and his son Scott), that Scott was running the family hog farm, which became a source of potential friction between the plaintiff and his son and potential embarrassment for the plaintiff that his son was operating the family business.
10. Dr. Puente noted that the plaintiff was depressed, that he could not return to work operating heavy equipment, and did not want to be thought of as "disabled." Although the plaintiff is physically capable of performing many tasks associated with his hog farm operation, he does not have the cognitive skills to operate the entire business. Further, Dr. Puente does not believe that the plaintiff could return to work earning wages in any competitive employment, due to his cognitive and emotional impairments.
11. Dr. Margit Royal, a neurologist, has evaluated the plaintiff twice, for about an hour and a half each visit, first on June 16, 1997, and again on February 6, 2002. At the first visit, Dr. Royal noted that the plaintiff had difficulty with focus, concentration, and memory. She found a normal neurological exam, and no neurological reason he could not return to work. However, she noted he was either malingering or experiencing a stress reaction to his injury.
12. After her second examination of the plaintiff in 2002, Dr. Royal declined to assess malingering or stress disorder, and testified these were psychiatric disorders to be determined by a neuropsychiatrist or neuropsychologist. In her deposition, Dr. Royal described the plaintiff as an "emotionally fragile" person, who had gone through a "life-threatening trauma." She acknowledged that he could have sustained post-concussive syndrome. Dr. Royal thought that the plaintiff was physically capable of working on his hog farm, but admitted that the plaintiff may lack the cognitive function, particularly organization skills, to consistently perform the work.
13. At the defendants request, Dr. C. Thomas Gualtieri examined the plaintiff on October 22, 2001 for about three hours. Dr. Gualtieri is a well-known neuropsychiatrist. Although Dr. Gualtieri and Dr. Puente are not personal acquaintances, they have expressed mutual respect for the other's professional opinion and they have mutually referred patients to each other. Gualtieri referred to Dr. Puente as "a very prominent neuropsychologist in Wilmington." The Full Commission finds both to be credible witnesses.
14. Dr. Gualtieri's testimony supports aspects of both Dr. Royal's findings and Dr. Puente's. Dr. Gualtieri administered tests for head injuries including a SCL-90 questionnaire of medical and psychological symptoms, on which the plaintiff scored his symptoms extremely high. Although Dr. Gualtieri thought the plaintiff might be exaggerating his symptoms, he did not assess him as malingering. On the ADHD subscales the plaintiff scored very high, indicating hyperactivity, restlessness, inability to pay attention, emotional instability, and irritability.
15. Dr. Gualtieri testified that in his opinion, the plaintiff is not suffering from post traumatic stress disorder (PTSD). Dr. Gualtieri determined that the plaintiff suffers from a premorbid condition of atherosclerotic changes in the blood vessels of his brain, which made him more susceptible to traumatic injury. Dr. Gualtieri also assessed the plaintiff with a traumatic injury to his brain, with persistent problems resulting from that injury, including headache, tinnitus, cognitive problems and emotional problems.
16. All the physicians acknowledge that the plaintiff appears to be physically fit and healthy, although he has high blood pressure. The barriers to the plaintiff's inability to earn wages are his cognitive and behavioral impairments caused by the head injury. In weighing the opinions of the physicians, the undersigned has given the greatest weight to the opinions expressed by Dr. Puente, since he has the most extensive history of contact and treatment of the plaintiff. Based upon Dr. Puente's testimony, the Full Commission finds that the plaintiff is psychologically disabled and has developed severe headaches, ear ringing, a hypersensitivity to noise and cognitive and emotional restrictions as a result of his injury by accident.
17. The defendants offered vocational rehabilitation to the plaintiff over the course of several years, but the same was not successful. In March 2000, Robert Manning, Jr. with Southern Rehabilitation Network, Inc., began working with the plaintiff. In October 2000, Mr. Manning visited the plaintiff, and his son Scott on the hog farm, when the plaintiff was sitting in the office. Mr. Manning testified that working with the hogs is physically intensive work.
18. In December 2000, at the direction of the defendants, the plaintiff visited a sheltered workshop. The plaintiff was overwhelmed by the noise and number of developmentally disabled individuals at the shelter and left after a few minutes. Mr. Manning testified that the attempt to rehabilitate the plaintiff in a sheltered workshop was a wasted cause. The plaintiff's decision to walk out of the sheltered workshop was a reasonable reaction.
19. Scott Hunter was only sixteen years old when his father was injured on May 6, 1996. However, the hog farm was already in operation and Scott grew up working on the farm, familiar with the operation. All the testimony, including that from friends or business acquaintances and the plaintiff's brother James Hunter, a former partner in the hog farm, shows that Scott Hunter is a hard-working young man, and that after his father's injury in May 1996, Scott rose to the occasion and basically took over the physical day-to-day operations of the farm.
20. Scott Hunter was a minor and did not have the credit history to take over financial ownership of the farm when his father was first injured. As a result, the plaintiff continued to sign as owner of the business on grower agreements, equipment purchases and financial documents until Scott was able to acquire a one-half ownership interest in Hunter Hog Farm in 2002.
21. Since May 6, 1996, Scott Hunter has been responsible for the day-to-day operations of the hog farm including driving the tractors, mowing the grass, irrigating the animals, pulling out the dead hogs, bailing the hay, operating the equipment, cleaning the hog houses, identifying whether there were sick or diseased animals, ordering the feed and all other tasks related to the hog farm.
22. The evidence also shows that the Hunter Hog Farm is truly a family business. The plaintiff's wife, Dale Hunter is involved in the financial aspects of the business. Otherwise, the family has hired an accountant.
23. Dr. Russell Lamb, an economics expert, was hired by the defendants to assess the financial condition and profit/loss from Hunter Hog Farm. Dr. Lamb reviewed a box of documents provided by the plaintiff's family and testified regarding his financial assessment.
24. Dr. Lamb has never met the plaintiff, never talked to anyone who has ever done business with the plaintiff, and has never met Scott Hunter or Dale Hunter. Further, Dr. Lamb does not have the expertise necessary to render an opinion about the plaintiff's physical capacity or the extent of the plaintiff's head injury, or cognitive deficits. He has never visited the Hunter Hog Farm or observed the day-to-day operation. The Full Commission finds that, to the extent that Dr. Lamb's conclusions about the economic status of Hunter Hog Farm are based upon incomplete information about the actual operations of the farm and who manages it and does the work, they are insufficient and not persuasive to establish any wage earning capacity on the part of the plaintiff.
25. Since his injury by accident, the plaintiff has done a limited amount of work on Hunter Hog Farm, but he is not involved in day-to-day operations or in management of the business. The plaintiff has walked the farm, co-signed loans, purchased equipment and signed grower agreements.
26. Dr. Puente testified that after 84 treatment sessions it was his opinion that the plaintiff could not compete in the competitive labor market with the skills that he utilizes on his farm when the plaintiff's limitations, age, education and experience are considered. Bob Manning, the vocational rehabilitation expert hired by the defendants, testified that there was "no way" the plaintiff could get a job in the competitive labor market when one considers his physical and mental limitations. Dr. Gualtieri testified that the plaintiff was capable of doing some gainful work but that there was nothing in his evaluation that would speak to whether the plaintiff could perform certain tasks associated with running a hog farm. Dr. Royal testified that the skills required on a hog farm require physical and cognitive abilities and in her opinion the plaintiff could perform the physical tasks, but might lack the organizational thinking to do it on a consistent basis.
27. The evidence in this case demonstrates that the skills that the plaintiff uses on Hunter Hog Farm would not enable him to be employable in the competitive labor market considering his physical limitations, age, education and experience.
28. The tax records of Hunter Hog Farm demonstrate that it has operated at a taxable net loss since the plaintiff's injury in 1996. The plaintiff has never been paid a wage by Hunter Hog Farm.
29. Because the insurer brought this appeal, the Full Commission finds the award of attorney's fees and costs pursuant to N.C. Gen. Stat. § 97-88 to be reasonable.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Because the parties entered into a Form 21 Agreement, the plaintiff has the benefit of a presumption of total disability.Franklin v. Broyhill Furniture Indus., 123 N.C. App. 200, 205,472 S.E.2d 382, 386 (1996); Kisiah v. W.R. Kisiah Plumbing,Inc., 124 N.C. App. 72, 476 S.E.2d 434 (1996).
2. The plaintiff's ownership of Hunter Hog Farm does not support a finding of wage earning capacity because the plaintiff is not actively involved in the day-to-day operations of the farm and the skills that he utilizes on the farm would not allow him to be employable in the competitive market place when considering his physical limitations, age, education and experience. Lanningv. Fieldcrest-Cannon, Inc., 352 N.C. 98, 107, 530 S.E.2d 54, 60
(2000).
3. The plaintiff sustained a traumatic brain injury as a result of the May 6, 1996 injury by accident, which caused personality changes, anxiety, depression and a decrease in his cognitive abilities. The plaintiff does not have the capacity to earn the wages which he was receiving at the time of his injury in the same or any other employment as a result of his traumatic brain injury and has been and continues to be totally disabled under the North Carolina Workers' Compensation Act. N.C. Gen. Stat. §97-2(9).
4. The greater weight of the evidence fails to establish that the plaintiff will ever be able to return to work in competitive employment. The plaintiff is entitled to ongoing total disability compensation at the weekly rate of $390.00 from May 6, 1996, to the present and continuing for the remainder of his life. N.C. Gen. Stat. § 97-29.
5. The plaintiff is entitled to have the defendants continue to provide all medical treatment necessitated by his closed head injury, including any necessary ongoing neuropsychological treatment. N.C. Gen. Stat. §§ 97-2 (19); 97-25.
6. Section 97-88 of the N.C. General Statutes provides in pertinent part:
 If the Industrial Commission at a hearing on review . . . shall find that such hearing or proceedings were brought by the insurer and the Commission . . . by its decision orders the insurer to make, or to continue payments of benefits, including compensation for medical expenses, to the injured employee, the Commission . . . may further order that the cost to the injured employee of such hearing or proceedings including therein reasonable attorney's fee to be determined by the Commission shall be paid by the insurer as a part of the bill of costs.
See Id. Because the insurer brought this appeal, the Full Commission finds the award of attorney's fees and costs pursuant to N.C. Gen. Stat. § 97-88 to be reasonable.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. The defendants shall pay to the plaintiff permanent and total disability compensation at the weekly rate of $390.00 per week from the date of this Award and continuing for the remainder of the plaintiff's lifetime.
2. The defendants are ordered to pay the reasonable attorney's fee of twenty-five percent (25%) of the compensation due under paragraph number one of this award. The plaintiff's counsel shall be paid by every fourth check due for all future compensation.
3. The plaintiff, within thirty (30) days of the entry of this Opinion and Award, shall provide the Commission with an affidavit and itemized statement of hours spent in the defense of this appeal before the Full Commission. The Commission, by separate Order, will thereafter provide for fees and costs pursuant to N.C. Gen. Stat. § 97-88.
4. The defendants shall pay all costs.
This 9th day of August 2006.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER